# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

L&M HEALTHCARE
COMMUNICATIONS LLC,

          Plaintiff,

v.

NATALIE PANTANO, *et al.*,

          Defendants.

Civil Action No.: 22-481 (JKS)(AME)

**SPECIAL MASTER
REPORT AND RECOMMENDATION**

**<u>WOLFSON, Special Master</u>**:

In this unfair competition suit, Defendant Lumanity Creative Strategy and Engagement, Inc. ("Defendant" or "Lumanity"), formerly known as Guidemark Health, Inc.,[1] moves to amend its Answer to add two counterclaims, *i.e.*, tortious interference of contract and prospective economic advantage (together, "Proposed Counterclaims"), pursuant to Fed. R. Civ. P. 15(a), which Plaintiff L&M Healthcare Communications LLC ("Plaintiff" or "L&M") has opposed. Defendant alleges that Plaintiff tortiously interfered with its contractual and future relationship with Organogenesis Inc. ("Organogenesis"), a former customer of Lumanity, by threatening litigation. Plaintiff argues that not only are Defendant's allegations in this regard futile, but Defendant's proposed claims are untimely, unduly prejudicial to Plaintiff, and subject to New Jersey's Anti-SLAPP laws. The Court referred this Motion to me for a Report and Recommendation in my role as the

---

[1]      To avoid confusion, I will refer to Guidemark as Lumanity throughout this R&R.

appointed Special Master, and for the reasons set forth herein, I recommend that the Court **DENY** Defendant's motion for leave to amend.

## BACKGROUND AND PROCEDURAL HISTORY

I.    **The Instant Lawsuit**

L&M is in the industry of providing "speaker bureau management services" for "biotechnology and pharmaceutical companies," which services include "speaker tracking, scheduling and reporting." (Compl., ¶ 6.) To advance its business, L&M has developed the STARS System, a proprietary program that stores data including "information about speakers, along with speaker contact information and therapeutic area." (*Id.* ¶ 8.) The System features, *inter alia*, proprietary methods of organizing and displaying data and delivery speaker bureau services to its . . . . clients." (*Id.*) As such, according to L&M, this System is not publicly available and "would be of great value to competitors." (*Id.*)

L&M brough this lawsuit against, among others, Lumanity and L&M's former employee, Natlie Pantano, alleging that using stolen credentials, they accessed portions of L&M's STARS System and stole proprietary and confidential information. (*Id.* ¶¶ 50-51.) L&M further avers that Lumanity used such information to "get a head-start in developing or refining a copycat speaker bureau management system for [a] Massachusetts-Based Client . . . ." (*Id.* ¶ 56.) From 2006 until December 2021, this particular client, identified by Lumanity's Proposed Counterclaims as Organogenesis, hired L&M to provide speaker bureau management services. (*Id.* ¶ 42; *see* Proposed Counterclaims ("PC"), ¶ 2.) However, according to L&M, Organogenesis "abruptly" and

inexplicably terminated its business relationship with L&M. (Compl., ¶ 49.) This termination led L&M to conduct a forensic investigation that purportedly uncovered Lumanity's alleged "malfeasance." (*Id.* ¶ 51.)

## II.    Lumanity's Proposed Counterclaims

Lumanity is an "advertising agency that serves the healthcare industry by offering various services relating to marketing, media communications, training, advertising branding and learning solutions." (PC, ¶ 1.) Lumanity alleges that in early 2021, Organogenesis sought to transition certain portions of its business to other entities, and to that end, in April 2021, Organogenesis contacted a Lumanity (then-Guidemark) representative "inquiring" about, and "soliciting" Lumanity's services. (*Id.* ¶¶ 5-9.) During this conversation, Organogenesis informed Lumanity that its current vendor (L&M) "had a lot of inefficiencies with their products and Organogenesis was not satisfied with the quality of L&M's services and products." (*Id.* ¶ 10.) Shortly thereafter, Organogenesis and Lumanity executed a Mutual Non-Disclosure Agreement, in which they agreed to share confidential information in furtherance of their "potential and on-going business relationship." (*Id.* ¶ 12.) In that connection, Lumanity alleges that it prepared and submitted a Statement of Work ("SOW"), solicited by Organogenesis, for a particular project that could have earned Lumanity approximately $55,000 for its services. (*Id.* ¶ 15.) Moreover, Lumanity claims that Organogenesis continued to reach out to Lumanity for additional future projects and training opportunities. (*See id.* ¶¶ 17-19.) In that regard, Lumanity alleges that it submitted an estimate for a speaker training project to Organogenesis that totaled approximately $134,000. (*Id.* ¶ 20.)

In mid-July 2021, Organogenesis met with Lumanity to preview Lumanity's proprietary WeConvEEn speaker bureau portal, (*id.* ¶ 22), which rivaled L&M's STARS System.   After this demonstration, Lumanity alleges that Organogenesis made the decision to switch from L&M to Lumanity for speaker bureau services, and thus, entered into a Master Services Agreement ("MSA") that would run for a 3-year period.   (*Id.* ¶¶ 26-27, 41) Eventually, Lumanity and Organogenesis executed a SOW under which Lumanity "was to set up a speaker management system to be hosted on [Lumanity's] WeConvEEn portal." (*Id.* ¶ 35.) Lumanity avers that after learning that Organogenesis had authorized Lumanity to access L&M's speaker bureau portal for transitioning purposes, L&M allegedly "undertook a scheme to try and destroy [Lumanity's] business and contractual relationship with Organogenesis." (*Id.* ¶ 43.)

According to Lumanity, L&M restricted access to the portal to prevent Lumanity from retrieving any of the remaining assets of Organogenesis despite the fact that L&M was contractually obligated to deliver all such information to Organogenesis upon termination of their contract.   (*Id.* ¶ 44.) Lumanity alleges that, by letter dated December 13, 2021 (the "December 13th Letter" or "Letter"), L&M contacted Organogenesis, accusing Lumanity of "theft and criminal activity and informed Organogenesis that it would be notifying the appropriate authorities."[2] (*Id.* ¶ 48.)  Responding to that letter,

---

[2]    Plaintiff attached the December 13th Letter to its opposition. While Defendant did not attach the Letter as an exhibit to its proposed amended Answer and Counterclaims, I nevertheless may consider the content of the Letter because it was referenced by, and indeed forms the basis of, the Proposed Counterclaims.  *See Joe Hand Promotions, Inc. v. Mills*, 567 F. Supp. 2d 719, 728 n. 13 (D.N.J. 2008).

Organogenesis confirmed that: "(i) it authorized [Lumanity] to access the portal that L&M was hosting in order for [Lumanity] to assist with the transfer of information; (ii) there were no security concerns; and (iii) that such authorization was permissible under the MSA between L&M and Organogenesis." (*Id.* ¶ 49.) Importantly, Organogenesis further confirmed that it had entered into a MSA with Lumanity and that Lumanity would be providing Organogenesis with a speaker bureau portal going forward. (*Id.* ¶ 44.)

In addition to allegedly improperly withholding Organogenesis's own information "hostage," Lumanity alleges that L&M's threat of litigation and criminal proceedings, by way of the December 13th Letter, was made in an effort to interfere with the contractual relationship between Lumanity and Organogenesis. (*Id.* ¶¶ 51, 54.) Lumanity avers that L&M knew that these threats would "force" Organogenesis to terminate its relationship with Lumanity and that Organogenesis would have "no choice" but to return to L&M since it was not practical for it to seek out a new vendor. (*Id.* ¶¶ 55-56.) Essentially, as Lumanity avers, L&M's scheme was to ensure that "it would be too burdensome, too expensive and not practical for Organogenesis to continue its contractual and business relationship with Lumanity, forcing Organogenesis to run back to L&M." (*Id.* ¶ 57.) On January 20, 2022, Organogenesis informed Lumanity that "it would not be moving forward with the Speaker Bureau SOW and would be staying with L&M for such services." (*Id.* ¶ 58.) On February 25, 2022, after the initiation of this suit, Organogenesis terminated the MSA with Lumanity. (*Id.* ¶ 68.)

5

Based on these allegations, pursuant to Fed. R. Civ. P. 15(a), Lumanity seeks leave to amend its Answer to add two counterclaims: 1) tortious interference with contractual relationship; and 2) tortious interference with prospective economic advantage.

## III.    Procedural History

The initial Pre-Trial Scheduling Order ("Scheduling Order") was entered by the Court on May 20, 2022.  Under that Order, motions to amend the pleadings were to be filed no later than July 29, 2022, which deadline was later amended to September 7, 2022, on Plaintiff's request; this deadline has not been amended since then.  The Order also set forth a discovery end date of October 24, 2022, which, through two separate extensions, has been extended to April 21, 2023.[3]

Relevant to this motion, on May 27, 2022, Lumanity served L&M with its first request for the production of documents. L&M commenced production in response to those requests. According to Lumanity, it was not until April 2023 that L&M fully produced the relevant documents and communications upon which Lumanity relies in asserting its Proposed Counterclaims. Counsel for Lumanity further explained that due to other pressing issues in this case and others, the Court was not notified of Lumanity's intent to file the instant Motion and Proposed Counterclaims until September 27, 2023— a year after the deadline to amend had lapsed and approximately five and a half months after Lumanity admittedly became aware of all the facts necessary to plead its Proposed

---

[3]    In his September 29, 2023 Order, the Magistrate Judge authorized me, in my role as the Special Master, to modify the discovery schedule should good cause exist to do so. At this time, I have not set a discovery end date; however, the parties have indicated that they anticipate discovery to end in early 2024.

Counterclaims.  Because of its late filing, Plaintiff opposes the Motion based on undue delay under Rule 16(b)(4) and Rule 15(a)(2), as well as on prejudice and futility grounds.

## DISCUSSION

### I.    Rule 16(b)(4)

As a preliminary matter, the parties dispute whether Rule 16(b) governs Defendant's motion to amend. Defendant acknowledges that because the deadline to amend the pleadings, i.e., September 7, 2022, has long passed, its late-filed motion would typically be subjected to Rule 16's good cause standard.  But, in arguing fairness, Defendant maintains that since the deadline to amend is "outdated" in the Scheduling Order, Rule 15 should nevertheless govern.  Plaintiff, on the other hand, argues that Defendant lacks good cause to file a belated motion for leave to amend. I note that the text of the Rules does not necessarily provide the relief that Defendant seeks; a straightforward reading of the Rule 16(b)(4) is clear: "A schedule may be modified only for good cause and with the judge's consent."  Fed. R. Civ. P. 16(b)(4). In other words, the good cause standard applies once the deadline in a scheduling order elapses.

However, I recognize that it is not unusual for discovery dates to be amended in scheduling orders without adjusting other deadlines, such as when to amend pleadings. This fact is demonstrated by two cases cited by Defendant: *EBIN New York, Inc. v. Young Chul Lee*, No. 17-13509, 2019 U.S. Dist. LEXIS 178298, at *3-7 (D.N.J. Oct. 11, 2019) and *Marinac v. Mondelez Int'l, Inc.*, No. 14-7606, 2019 U.S. Dist. LEXIS 13890 (D.N.J. Jan. 29, 2019).

First, in *EBIN*, the plaintiff there filed a motion to amend approximately one year after the deadline to amend set forth in the pretrial scheduling order. *EBIN*, 2019 U.S. Dist. LEXIS 178298, at *3. The court nevertheless applied Rule 15, not Rule 16, because it reasoned that while discovery deadlines were extended, the motion to amend dates were inadvertently not updated, and importantly, little discovery had taken place when the plaintiff filed the motion. *Id.* at *6. The court found that it would be unfair to apply Rule 16 since the court contemplated the amendment deadline to be set "near . . . the close of discovery." *Id.* Further, the court noted that plaintiff did not unduly delay in seeking to amend. *Id.* at *7. Based on the facts of that case, the court applied Rule 15's more liberal standard as it relates to undue delay. Similar to *EBIN*, the *Marinac* Court found that although the deadline to amend had long expired, applying Rule 15 was proper since "very little discovery" had taken place, and the parties engaged in motion practice and participated in mediation such that "the entire scheduling order was never followed." *Marinac*, 2019 U.S. Dist. LEXIS 13890, at *5-6.

During the ordinary course of many cases, the parties may focus on amending discovery end dates rather than other deadlines imposed by scheduling orders, and as a result, so long as discovery is not an end, based on the procedural posture of the case, a court may exercise discretion to adjust already-lapsed deadlines *nunc pro tunc*. But, in doing so, the court must balance the equities. Based on what has been presented to me, here, I find that both sides have adequate bases for their arguments, and ultimately, this issue presents a close call. Because I find that the Proposed Counterclaims are futile, *see*

*infra*, I need not hinge my recommendation on whether Rule 16 applies, although I believe that Plaintiff has the better argument.

Indeed, in contrast to *EBIN* or *Marinac*, Defendant has not shown that applying Rule 16 would be patently "unfair." While discovery has not concluded, Defendant has the continuing obligation to keep the Court apprised of the status of discovery and seek to amend the scheduling order accordingly. *See Strategic Prods. & Servs., LLC v. Integrated Media Techs., Inc.*, No. 18-694, 2020 U.S. Dist. LEXIS 180316, at *5 (D.N.J. Sep. 30, 2020); *see also McGrath v. Rainbow Pediatrics, P.C.*, No. 19-4714, 2021 U.S. Dist. LEXIS 153678, at *5 (D.N.J. Aug. 16, 2021) (finding that while "several scheduling orders were entered . . . extending deadlines relating to pretrial discovery and dispositive motions[,]" at no point was "an extension given for the time to seek amendments," and "because leave to amend is being sought beyond the [amendment] deadline, plaintiff must surmount both Rule 16(b)(4) and Rule 15(a)(2)"). Defendant did not do so. In fact, the last request to extend the amendment deadline was made by *Plaintiff*, and not objected to by Defendant, in July 2022. Based on that request, Defendant should have been aware of its obligation, and could have—but did not—seek additional extensions.[4] Indeed, "scheduling orders are at the heart of case management. If they can be disregarded without a specific showing of good cause, their utility will be severely impaired." *Koplove v. Ford Motor Co.*, 795 F.2d 15,

---

[4]    Defendant argues that because it was not provided with the information needed to responsibly assert counterclaims until April 2023, it could not have complied before the deadline passed in the Scheduling Order. (Def. Brief in Support, pp. 14-15.) This argument is not convincing; Defendant had an obligation to seek to extend the deadline to amend *regardless* whether it had knowledge of any alleged wrongdoing.

18 (3d Cir. 1986). Where a party chooses to disregard the reasonable scheduling orders of the court, it does so at its peril. *Mobley v. City of Atl. City Police Dep't*, No. 97-2086, 1999 U.S. Dist. LEXIS 21121, at *12 (D.N.J. June 24, 1999). "Any prejudice . . . suffered therefrom resulted from a self-inflicted wound." *Public Loan Co. v. FDIC*, 803 F.2d 82, 87 (3d Cir. 1986).

If I were to apply Rule 16, it is unlikely that Defendant would satisfy the good cause standard. "'Good cause' exists when the [s]chedule cannot reasonably be met despite the diligence of the party seeking the extension." *ICU Med., Inc. v. RyMed Techs., Inc.*, 674 F. Supp. 2d 574, 577 (D. Del. 2009). Unlike Rule 15(a), the Rule 16(b) standard focuses on the "diligence of the movant, and not on prejudice to the non-moving party." *Roquette Freres v. SPI Pharma*, Inc., 2009 U.S. Dist. LEXIS 43740, at *13 (D. Del. May 21, 2009). "A party must meet [Rule 16(b)'s] standard before a district court considers whether the party also meets Rule 15(a)'s more liberal standard." *Premier Comp Sols. v. UPMC, 970 F.3d 316, 319 (3d Cir. 2020).* Importantly, Rule 16(b)'s good cause standard imposes a greater degree of diligence than Rule 15(a). *See Barry v. Stryker Corp.*, No. 20-1787, 2022 U.S. Dist. LEXIS 206858, at *7 (D. Del. Nov. 15, 2022) (finding that Rule 15 is a "less demanding" standard than Rule 16's "good cause" standard).

Here, Lumanity argues that it has a valid excuse for seeking leave to amend at this juncture; that is, Lumanity was not aware of essential facts and circumstances leading Organogenesis to terminate its contractual and business relationship with Lumanity, until it obtained highly relevant documents in April 2023, when L&M produced these documents approximately a year after Lumanity's requests. L&M, on the other hand,

claims that Lumanity knew of its claims long before the pleading amendment deadline. In presenting these arguments, the parties direct me to various documents in the record. Each side contends that these documents support their respective positions on when Lumanity became aware of the facts necessary to assert its Proposed Counterclaims. On this motion, I accept Lumanity's representations that it lacked sufficient factual bases to plausibly allege the tortious interference claims until April 2023.

However, Lumanity did not seek to amend until September 27, 2023—approximately five and a half months after it admittedly became aware all of the alleged underlying facts. To account for this block of time, Lumanity explains that i) in April 2023, counsel spent a significant amount of time reviewing documents produced by L&M; ii) in May and June 2023, substantial time was spent on motion practice related to subpoenas and other voluminous discovery production in this case; iii) in July and August 2023, a significant portion of counsel's time was spent on expert-related matters; and finally, iv) in September 2023, counsel had to prepare and conduct certain depositions and attend to other discovery related tasks. While, as the Special Master presiding over the parties' discovery disputes during the same timeframe, I appreciate the tight and busy schedule that counsel experienced, Lumanity was nevertheless under the obligation of diligence imposed by Rule 16. The garden variety attorney tasks related to discovery—no matter how onerous they might have been—are not sufficient to excuse the late filings, particularly since Lumanity's counsel have the resources of their firm to support them. In that regard, the cases are replete with instances where an attorney's workload does not constitute good cause. *See Branch Banking & Trust Co. v. D.M.S.I., LLC,*

No. 11-01778, 2013 U.S. Dist. LEXIS 87450, at *1 (D. Nev. June 21, 2013) (finding excuse that parties and their counsel "were very busy . . . does not constitute 'good cause' pursuant to Fed. R. Civ. P. 16"), *aff'd*, 871 F.3d 751, 765 (9th Cir. 2017); *Chebro v. Great Dane, LLC*, No. 19-1495, 2020 U.S. Dist. LEXIS 139553, at *7 (D. Conn. Aug. 5, 2020) (finding that counsel's busy schedule is not valid an excuse for failing to comply with a court deadline); *Scalia v. Cnty. of Kern*, No. 17-01097, 2018 U.S. Dist. LEXIS 215215, at *1-2 (E.D. Cal. Dec. 21, 2018) (finding that the fact that "plaintiff's counsel has been so busy with other activities that he has available . . . does not constitute good cause to amend the case schedule, and that by its very nature, litigation requires attorneys to be incredibly busy"); *Shemendera v. First Niagara Bank N.A.*, 288 F.R.D. 251, 253 (W.D.N.Y. 2012) ("An attorney's busy schedule or scheduling conflicts are seldom sufficient to demonstrate good cause."); *see also Hayford v. Nationstar Mortg. LLC*, No. 16-04480, 2017 U.S. Dist. LEXIS 28911, at *4 (D. Ariz. Feb. 28, 2017) (finding that "a busy attorney does not constitute good cause for the requested delay").

Moreover, even where, as here, a party discovers new information leading to additional claims after the deadline to amend has passed, the good cause standard requires that the party seeking to amend exercise diligence and "request an extension of the deadline to amend pleadings, or at the very least, promptly raise the issue with the Court." *Lasermaster Int'l Inc. v. Netherlands Ins. Co.*, No. 15-7614, 2021 U.S. Dist. LEXIS 154100, at *7 (D.N.J. Aug. 13, 2021). The good cause standard is not satisfied where a party "had several months in which it could have raised concerns over the possibility of moving to amend but failed to do so," and such a delay is "detrimental" to an amendment

governed by Rule 16. *Id.* at *8; *see Cap. Health Sys., Inc. v. Veznedaroglu*, No. 15-8288, 2019 U.S. Dist. LEXIS 205126, at *23 (D.N.J. Nov. 26, 2019) (denying leave to amend where plaintiff obtained relevant evidence after the deadline to amend and "sat on the evidence for an inexplicable amount of time").

Here, in an August 2, 2022 Letter Order, the Magistrate Judge extended the deadline to amend pleadings to September 7, 2022. That deadline was never extended by subsequent orders extending other discovery dates. On September 27, 2023—over a year after the deadline to amend—Lumanity requested leave to file its Proposed Counterclaims. In response, the Court, in an Order dated September 29, 2023, permitted Lumanity to file its contested motion to amend. Lumanity's request came approximately five and a half months after it uncovered "sufficient evidence that L&M tortiously interfered with Lumanity's contractual relationship and prospective business relationship with third-party Organogenesis, Inc., resulting in substantial monetary harm to Lumanity." (Lumanity's Letter Request dated September 27, 2023, p. 1.) But, Lumanity, represented by sophisticated counsel, "sat on the evidence" for a substantial period of time before advising the Court that it intended to amend its Answer, even though it had the obligation to—at least—promptly raise it with the Court. Without any valid explanation, *see supra*, courts in this district have deemed nearly six months of delay inexcusable under Rule 16. *See Eastern Minerals & Chems. Co. v. Mahan,* 225 F.3d 330, 340 (3d Cir. 2000) (finding no abuse of discretion where district court denied motion to amend complaint filed six months after the deadline expired given absence of good cause); *Pfizer Inc. v. Sandoz Inc.*, No. 12-654, 2013 U.S. Dist. LEXIS 157357, at * (D. Del. Nov. 4, 2013)

(finding lack of diligence under Rule 16 and undue delay under Rule 15(a) where the defendant delayed in seeking leave to amend after having the documents in its possession for four months); *NRT Tech. Corp. v. Everi Holdings Inc.*, No. 19-804, 2022 U.S. Dist. LEXIS 5698, at * (D. Del. Jan. 11, 2022) ("Defendants' delay in producing documents does not give Plaintiffs license to delay seeking leave to amend for an additional six months."); *Barry v. Stryker Corp.*, No. 20-1787, 2022 U.S. Dist. LEXIS 206858, at *8 (D. Del. Nov. 15, 2022) ("five months elapsed from the time Defendants acquired the information to the time they filed the motion, and shorter delays have been found to negate arguments for good cause").

Accordingly, should Rule 16 apply, I would find that Defendant failed to demonstrate good cause such that it could be excused from filing an untimely motion to amend after the expiration of the deadline, *i.e.*, September 7, 2022, imposed by the Scheduling Order.[5] It is not necessary to draw that conclusion, because, for the reasons below, I find that the Proposed Counterclaims are futile.

## II.    Rule 15(a)

Pursuant to Federal Rule of Civil Procedure 15, once the time to amend as of right has expired, "a party may amend its pleading only with the opposing party's written consent or the court's leave." Fed. R. Civ. P. 15(a)(2). Courts are to "freely give leave when justice so requires." *Id.* The decision to grant leave to amend rests within the sound

---

[5]    While my recommendation does not depend on the application of Rule 16, should there be an objection to my recommendation, the Court may, in its discretion, review my good cause analysis.

discretion of the trial court. *Zenith Radio Corp. v. Hazeltine Research Inc.*, 401 U.S. 321, 330 (1970). The Third Circuit has noted that "[t]here are three instances when a court typically may exercise its discretion to deny a Rule 15(a) motion for leave to amend: when '(1) the moving party has demonstrated undue delay, bad faith or dilatory motives, (2) the amendment would be futile, or (3) the amendment would prejudice the other party.'" *United States ex rel. Customs Fraud Investigations, LLC. v. Victaulic Co.*, 839 F.3d 242, 249 (3d Cir. 2016). Although it is based on Rule 16, I have already provided my view regarding timing and delay. *See, supra*. I turn to prejudice.

### A.    Prejudice

As to the prejudice prong, I do not find that Plaintiff would be prejudiced. When evaluating prejudice to the non-moving party in the context of a motion to amend, courts in the Third Circuit consider whether amendment would impair the non-moving party's "ability to present its case," *Dente v. Saxon Mortg.*, No. 11-6933, 2012 U.S. Dist. LEXIS 66588, at *5 (D.N.J. May 11, 2012) (citing *Heyl & Patterson Int'l, Inc. v. F.D. Rich Housing of the V.I., Inc.*, 663 F.2d 419, 426 (3d Cir. 1981)), and "the amendment would force the opponent to expend significant additional resources to conduct discovery and prepare for trial, as well as whether it would significantly delay resolution of the action." *Ezaki Glico Kabushiki Kaisha v. Lotte Int'l Am. Corp.*, No. 15-5477, 2017 U.S. Dist. LEXIS 164222, at *11 (D.N.J. Oct. 4, 2017). Here, the discovery related to the Proposed Counterclaims has largely been completed. Moreover, because these Proposed Counterclaims involve, and overlap with, Plaintiff's affirmative claims, any additional discovery would not require

Plaintiff to expend significant resources to defend the claims or prepare for trial. I will next address futility.

### B.     Futility - Standard of Review

Futility means the pleading, as amended, would fail to state a claim upon which relief could be granted. *Shane v. Fauver*, 213 F.3d 113, 115 (3d Cir. 2000) (citation omitted). To determine whether a claim is futile, district courts apply the same standard of legal sufficiency as applies under Federal Rule of Civil Procedure 12(b)(6). *See id.* (citation omitted); *Travelers Indemnity Co. v. Dammann & Co., Inc.*, 594 F.3d 238, 243 (3d Cir. 2010) (citation omitted). I must accept as true all well-pleaded factual allegations asserted in Defendant's proposed amended pleading and determine whether the alleged facts support a facially plausible claim. *See Warren Gen. Hosp. v. Amgen Inc.*, 643 F.3d 77, 84 (3d Cir. 2011).

Under Rule 12(b)(6), a court must accept all well-pleaded allegations in the complaint as true and view them in the light most favorable to the plaintiff. *Evancho v. Fisher*, 423 F.3d 347, 351 (3d Cir. 2005). It is well settled that a pleading is sufficient if it contains "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). However, "[a]lthough the Federal Rules of Civil Procedure do not require a claimant to set forth an intricately detailed description of the asserted basis for relief, they do require that the pleadings give defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Baldwin Cnty. Welcome Ctr. v. Brown*, 466 U.S. 147, 149-50 n. 3 (1984) (quotation and citation omitted).  Following the *Twombly/Iqbal* standard, the Third Circuit applies a two-part analysis in reviewing a

pleading under Rule 12(b)(6). First, a district court must accept all of the pleading's well-pleaded facts as true, but may disregard any legal conclusions. *Fowler v. UPMC Shadyside,* 578 F.3d 203, 210 (3d Cir. 2009). Second, a district court must determine whether the facts alleged in the pleading are sufficient to show that the plaintiff has a "plausible claim for relief." *Id.*

### B.    Tortious Interference[6]

Under New Jersey law, a claim for tortious interference must allege: (i) "some protectable right—a prospective economic or contractual relationship"; (ii) "that the interference was done intentionally and with 'malice'"; (iii) "that the interference caused the loss of the prospective gain"; and (iv) "that the injury caused damage." *Printing Mart-Morristown v. Sharp Elecs. Corp.*, 116 N.J. 739, 751-52 (1989) (internal citations and quotations omitted). Furthermore, it is "fundamental" to such a cause of action that "the claim be directed against defendants who are not parties to the relationship." *Id.* at 752.

Here, the parties' dispute regarding the sufficiency of Defendant's tortious interference claims center on the malice element. As to this second element, state and federal New Jersey courts alike have defined the term malice as "the harm was inflicted intentionally and without justification or excuse." *MacDougall v. Weichert*, 144 N.J. 380, 404 (1996) (quoting *Printing Mart-Morristown*, 116 N.J. at 751); *see, e.g., Rainier's Dairies v. Raritan Val. Farms*, 19 N.J. 552, 563 (1955) ("malice, as here used in the legal sense, simply

---

[6]    The elements for both Lumanity's Proposed Counterclaims for tortious interference of contractual relationship and prospective economic advantage are functionally the same. As such, these claims will be discussed in tandem.

constitutes the intentional doing of a wrongful act without justification or excuse" (internal citations and quotations omitted)); *see also Austar Int'l Ltd. v. AustarPharma LLC*, 425 F. Supp. 3d 336, 359 (D.N.J. 2019) ("Although the common meaning of malice connotes ill-will toward another person, . . . malice in the legal sense is the intentional doing of a wrongful act without justification or excuse" (internal citations and quotations omitted)).

A defendant "claiming a business-related excuse must justify not only its motive and purpose, but also the means used." *Lamorte Burns & Co. v. Walters*, 167 N.J. 285, 307 (2001). The relevant inquiry for malice is "whether the conduct was sanctioned by the 'rules of the game.'" *Id.* at 306; *see Woods Corp. Assocs. v. Signet Star Holdings, Inc.*, 910 F. Supp. 1019, 1031 (D.N.J. 1995) (explaining that "inquiry" for determining existence of malice is "whether the defendant's interference was sanctioned by the rules of the game" (internal citations and quotations omitted)); *Som Maior Audio E Video, LTDA v. Creston Elecs., Inc.*, No. 20-19864, 2021 U.S. Dist. LEXIS 232813, at *11-12 (D.N.J. Dec. 3, 2021). And, the "line clearly is drawn at conduct that is fraudulent, dishonest, or illegal." *Lamorte*, 167 N.J. at 307 (citing *Ideal Dairy Farms, Inc. v. Farmland Dairy Farms, Inc.*, 282 N.J. Super. 140, 205 (App. Div. 1995)); *Harper-Lawrence, Inc. v. United Merchants and Mfrs., Inc.*, 261 N.J. Super. 554, 568 (App. Div.), *cert. denied*, 134 N.J. 478 (1993) (finding the malicious conduct must be both "injurious and transgressive of generally accepted standards of common morality or of law").

1.    *Litigation Privilege*

In support of its tortious interference claims, Lumanity relies on the December 13th Letter sent by L&M to Organogenesis, the content of which will be discussed more fully, *infra*.  According to Lumanity, the Letter was sent to intentionally interfere with the contractual relationship between Organogenesis and Lumanity.  Lumanity further alleges that the Letter, *inter alia*, demonstrates malice as it threatened Organogenesis with "criminal prosecution and civil legal proceedings."  (PC, ¶ 55.)  In response, Plaintiff contends that Lumanity cannot use such a letter as evidence to support its claims because this and all other communications related to L&M's investigation into the nature and scope of the unauthorized accesses of its STARS system fall within the protection of New Jersey's litigation privilege. I disagree.

Under New Jersey law, "[t]he litigation privilege shields persons from liability arising from any communication (1) made in judicial or quasi-judicial proceedings; (2) by litigants or other participants authorized by law; (3) to achieve the objects of the litigation; and (4) that have some connection or logical relation to the action." *Williams v. BASF Catalysts LLC*, 765 F.3d 306, 319 (3d Cir. 2014) (quoting *Loigman v. Twp. Comm. of Middletown*, 185 N.J. 566, 585 (2006)); *see also Baglini v. Lauletta*, 338 N.J. Super. 282, 298 (App. Div. 2001) ("The privilege is not limited to statements made at trial; it extends to all statements or communications in connection with the judicial proceeding." (citation and quotation marks omitted)); *Rickenbach v. Wells Fargo Bank, N.A.*, 635 F. Supp. 2d 389, 401, 402 (D.N.J. 2009) (noting that the privilege is "expansive" and has been applied to pre-litigation "demand letters").

"Immunity from suit provided by the litigation privilege is predicated upon the policy concern that recognizes unfettered expression by litigants is critical to advancing the underlying government interest at stake in such settings." *Vitanza v. James*, No. A-4899-07T1, 2010 N.J. Super. Unpub. LEXIS 996, at *15 (App. Div. May 6, 2010) (citing *Erickson v. Marsh & McLennan Co.*, 117 N.J. 539, 563 (1990); *Rabinowitz v. Wahrenberger*, 406 N.J. Super. 126 (App. Div.) *appeal dismissed*, 200 N.J. 500 (2009)). Whether the privilege applies is a question of law for the court to decide. *Hawkins v. Harris*, 141 N.J. 207, 216 (1995).

Here, the December 13th Letter is not entitled to the protection of the litigation privilege because it was neither sent in the context of any judicial or quasi-judicial proceedings nor to further any objectives of future litigation. Rather, the Letter was sent by L&M to the Chief Commercial Officer and General Counsel of Organogenesis after L&M determined that its former employee, defendant Natalie Pantano, and Rose Deggendorf, an employee of Organogenesis, allegedly accessed L&M's portal related to Organogenesis without authorization. In that regard, L&M advised Organogenesis that L&M is taking "immediate action to address this illicit activity with Ms. Pantano and her current employer to ensure the protection and recovery of any stolen data from L&M systems concerning Organogenesis." (December 13, 2021 Letter, p. 1.) Additionally, the Letter went on to advise that Ms. Pantano's alleged conduct, and potentially Ms. Deggendorf's alleged participation, might have violated various federal and state laws, including criminal statutes. (*Id.* p. 2.) In that connection, L&M expressed concerns that Ms. Pantano might have misappropriated confidential information belonging to both

Organogenesis and L&M for the benefit of her new employer, i.e., Lumanity. (*Id.*) On its face, contrary to Lumanity's allegation, the Letter did not explicitly threaten litigation against Organogenesis. *See ALA, Inc. v. CCAIR, Inc.*, 29 F.3d 855, 859 n.8 (3d Cir. 1994) ("Where there is a disparity between a written instrument [referenced in] a pleading and an allegation in the pleading based thereon, the written instrument will control."). Instead, throughout the Letter, L&M struck a relatively cooperative tone; indeed, L&M stated that it does not wish to take any "precipitous action" against Ms. Deggendorf or "interfere with Organogenesis proper access to its information," and as such, L&M asked to "work together" with  Organogenesis "to further investigate" the alleged access. (*Id.*) Implicitly, at the time L&M sent the Letter, it suspected that Ms. Deggendorf's alleged conduct was performed without Organogenesis's knowledge.

Based on the content of the Letter, I cannot find that L&M sent the Letter to Organogenesis for the purposes of initiating a litigation against Organogenesis.  The Letter served not as a demand letter or pre-lawsuit communication regarding contemplated action against Organogenesis, but rather it sought further information from Organogenesis and advised Organogenesis of the alleged untoward conduct by one of its employees,  who, according to L&M, might have been working with Ms. Pantano unbeknownst to either company.  At no point in the Letter did L&M threaten to take any action against Organogenesis, even if a potential litigation could be pursued against its employee. *See D & D Assocs. v. Bd. of Educ.*, No. 03-1026, 2007 U.S. Dist. LEXIS 93867, at *67, n.13 (D.N.J. Dec. 21, 2007), *aff'd*, 552 F. App'x 110 (3d Cir. 2014) (declining to "extend the privilege to all situations where the relationship between the parties is contentious or

adversarial, and it is possible that one of the parties will commence an action in the future.").[7]    As such, the litigation privilege does not apply to shield the December 13th Letter.

        2.    *Malice*

Notwithstanding the fact that the letter is not protected by litigation privilege, Defendant still cannot sustain its tortious interference claims, because it has failed to adequately allege the element of malice.  In its Proposed Counterclaims, Defendant alleges unjustifiable conduct based on the following:[8]

1.  December 13th Letter;

2.  Imposing of a transition fee; and

3.  The current lawsuit.

None of this alleged conduct rises to the level of malice required by case law.  First, for substantially the same reason as to why the December 13th Letter does not fall within the litigation privilege, Defendant has failed to allege that the Letter was sent without

---

[7]    L&M further argues that L&M statements, namely those made in the December 13th Letter, are protected by New Jersey's newly-enacted anti-SLAPP statute, the Uniform Public Expression Protection Act ("UPEPA").  In that regard, L&M argues that should the Court ultimately permit Lumanity to assert its Proposed Counterclaims against L&M, L&M would be "forced to incur substantial fees and costs in filing an order to show cause seeking dismissal of such claims, which the UPEPA requires be filed within 60 days of service of such claims."  (L&M Opp. Br., p. 23.)  No court has had the occasion of interpreting the UPEPA since its passage in September 2023, and I do not need to do so here.  Because I recommend that amending the Proposed Counterclaims is futile, I do not need to consider whether any of L&M statements are protected under the UPEPA.

[8]    The parties' briefing mainly focused on the December 13th Letter. However, because the Proposed Counterclaims could be construed to raise these additional acts of interference, I will address them here.

justification. Indeed, L&M had a business reason to communicate with Organogenesis; that is, to advise Organogenesis that its employee might have assisted in the alleged unauthorized access of a portal containing confidential information belonging to both L&M and Organogenesis, and L&M sought Organogenesis's cooperation in investigating the alleged incident. (*See* December 13th Letter p. 2 ("We do not wish to take precipitous action against your personnel, nor do we wish to interfere with Organogenesis proper access to its information. However, L&M takes this security and confidentiality violation very seriously. We would ask that you please contact this office so that we can work together to further investigate this matter.")) Nothing from the content of the Letter suggests that L&M sent the Letter as "a warning" by threatening Organogenesis with litigation such that it would "crawl[] back to L&M." (Lumanity Reply Br., p. 9.) Except for Defendant's say-so, I cannot find that on its face, the Letter, nor any other pleaded facts, support an allegation that the Letter was sent with a fraudulent, dishonest, or illegal motive. Defendant places significant emphasis on a correspondence sent by Organogenesis to L&M, confirming that Organogenesis was aware of, and authorized, the access of its portal. (*See* Organogenesis's Letter dated December 20, 2021.) Having been so informed, Defendant alleges that L&M nonetheless continued to interfere with Lumanity's business relationship with Organogenesis. Critically, however, that correspondence was sent *after* the receipt of the December 13th Letter by Organogenesis. While I must take Defendant's allegations as true on this motion, I need not accept bald assertions that have no factual underpinnings. *See Nostrame v. Santiago*, 213 N.J. 109, 127-29 (2013) (affirming dismissal of tortious interference claim because "plaintiff's complaint

is based on nothing more than his unsupported suspicion"); *Earle Asphalt Co. v. Cnty. of Camden*, No. 21-11162, 2022 U.S. Dist. LEXIS 111277, at *15 (D.N.J. June 23, 2022).  In that regard, without more, Defendant's allegation of ill-motive or unjustifiable conduct finds no support from the December 13th Letter.

Next, Defendant alleges that, to harm the contractual relationship between Lumanity and Organogenesis, L&M imposed an "exorbitant fee" on Organogenesis when it sought to obtain its own information from L&M. (PC, ¶ 53.)  But, the fact that a party acted "'to advance [its] own interest and financial position' does not establish the necessary malice or wrongful conduct" for a tortious interference claim. *Dello Russo v. Nagel*, 358 N.J. Super. 254, 268 (App. Div. 2003) (quoting *Sandler v. Lawn-A-Mat Chem. & Equip. Corp.*, 141 N.J. Super. 437, 451-52 (App. Div. 1976)); *Coast to Coast Ent., LLC v. Coastal Amusements, Inc.*, 2005 U.S. Dist. LEXIS 26849, at *73 (D.N.J. Nov. 7, 2005).  Aside from Defendant's own conclusory reason why L&M allegedly imposed such a fee, there are no other allegations to support this conclusion. In fact, factual allegations surrounding it are quite sparse.  Defendant must additionally allege that the assessing the alleged fee constituted unlawful interference without any justification.  Without more, I cannot find that the alleged fee was "transgressive of generally accepted standards of common morality or of law." *Harper-Lawrence, Inc.*, 261 N.J. Super. at 568.

Finally, Defendant alleges that having learned that Organogenesis gave authorization to access its portal, L&M still used the filing of the present lawsuit not only to harass Lumanity, but to ensure that Organogenesis would terminate its contractual and business relationship with Lumanity, which termination occurred after the lawsuit

24

was brought. (PC, ¶ 64.)  Again, the filing of this suit clearly had a legitimate purpose—to seek damages for, *inter alia*, the alleged misappropriation of trade secret by defendants, including Lumanity.  Defendant is hard pressed to argue that Plaintiff had no justification in filing this suit, even if Organogenesis terminated its contractual relationship with Lumanity, in part, based on the existence of this suit.  The relevant inquiry is whether Lumanity lacked justification in filing the suit, and on this point, Defendant's allegations fall short.

In sum, Defendant's allegations of a pattern of unjustifiable conduct on the part of L&M are rather seemingly legitimate courses of action taken after L&M determined that its, as well as Organogenesis's, proprietary information was allegedly accessed and misappropriated by Ms. Pantano, with assistance from Ms. Deggendorf.  From sending the December 13th Letter to initiating this suit, either construing these acts singularly or in combination, L&M ostensibly took these actions to protect its business interests. Lumanity's allegations that L&M pursued these avenues based on some other ulterior motives lack any additional factual support to meet the plausibility standard under *Twombly/Iqbal*.  Even under liberal notice pleading standards, Defendant has not alleged its theory of unjustified interference beyond a speculative level.  Indeed, to plead malice, under new Jersey law, requires more than Defendant's supposition of Plaintiff's intent. Accordingly, because I find that Lumanity fails to adequately allege all the elements of

its tortious interference claims under Rule 15(a)'s futility standard, I recommend that Lumanity's motion for leave to amend be denied.[9]

DATED: December 29, 2023

/s/ Freda L. Wolfson
Hon. Freda L. Wolfson (ret.)
Special Master

---

[9]    I do not suggest that Defendant can never plead a set of facts that could satisfy the requirement for the element of malice. Rather, I find that Defendant has fallen short of doing so here. Defendant may request the Court for an opportunity to cure its Proposed Counterclaims.